## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| GILDA HAGAN-BROWN,<br><br>          Plaintiff,<br><br>vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>          Defendant. | Case No.: 1:14-cv-01614-AJT-JFA |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S
## MOTION TO TRANSFER PROCEEDINGS TO THE
## UNITED STATES DISTRICT COURT FOR THE SOUTHERN
## DISTRICT OF INDIANA PURSUANT TO 28 U.S.C. § 1404(a)

Making literally the same arguments and offering the same dire forecasts of plaintiffs-in-waiting, Plaintiff's counsel asked the Judicial Panel on Multidistrict Litigation to centralize this and other similar lawsuits for pre-trial purposes pursuant to 28 U.S.C. § 1407.  Lilly explained that these cases have been driven by individual issues, that significant discovery has already been provided, and that the benefits of centralization can be achieved through informal coordination among the small group of counsel involved on both sides.  The judges of the JPML rejected Plaintiff counsel's request to create an MDL, ruling that the statutory factors for transfer pursuant to § 1407 were not satisfied.

Faced with the "logistical nightmare" of litigating on their merits the cases filed and served to date, including this suit, Plaintiff's counsel seek to re-litigate the JPML's order by seeking a mid-stream transfer of this litigation from the venue of her original choosing to the Southern District of Indiana pursuant to 28 U.S.C. § 1404. (*See* Pl's. Mo., at 1.)  Plaintiff's counsel essentially admit that they do not want to devote the resources to litigate the individual

issues that predominate in their lawsuits, and would prefer to create a centralized forum that would permit the accumulation of suits effectively shielded from individual inquiry and resolution on the merits. The judges of the JPML have already denied this request, and this Court should likewise reject this effort to create a "*de facto* MDL." (*Id.* at 2.)

There is a reason that this Court and others apply a skeptical eye to procedural maneuvers of the sort proposed here. Transfer for all purposes under § 1404 is an exceptional tool for unique circumstances and not designed to be a pseudo-appellate vehicle for unhappy MDL petitioners. Plaintiff chose this forum. She chose this forum because it is the proper forum with the most connection to this lawsuit. She cannot now reverse course and meet her heavy burden to transfer the lawsuit away from her first chosen forum — especially in the middle of discovery and when such transfer is for all purposes and would meaningfully prevent Lilly from obtaining live testimony from the central third-party witnesses in the case. If Plaintiff believes centralization of this and other cases is statutorily warranted, she is free to re-petition for such a result from the JPML, the legislatively-created body designated for deciding just these precise questions. But she cannot employ § 1404 to achieve what she could not under § 1407.

## I.    BACKGROUND

### A.    The Longstanding Cymbalta Warning on Discontinuation Symptoms

Cymbalta is a serotonin norepinephrine reuptake inhibitor, or SNRI, approved for the treatment of certain psychiatric and pain disorders. With all antidepressants, there is an inherent risk that discontinuing the medicine, especially if stopped abruptly, can lead to certain unwanted symptoms. Since Cymbalta's initial approval in 2004, the FDA-approved Physician's Package Insert for the medicine has included a three-paragraph warning describing the potential for such symptoms. That warning, most of which was written by the FDA and applicable to all similar medicines, includes detailed information on (1) the specific adverse events seen above a certain

2

frequency in the Cymbalta clinical trial experience; (2) information on adverse events observed across the SNRI and selective serotonin reuptake inhibitor (or SSRI) class of antidepressant medicines; and (3) guidance on tapering the medicine to mitigate potential discontinuation symptoms:

> **Discontinuation of Treatment With Cymbalta**  Discontinuation symptoms have been systematically evaluated in patients taking duloxetine. Following abrupt or tapered discontinuation in placebo-controlled clinical trials, the following symptoms occurred at 1% or greater and at a significantly higher rate in duloxetine-treated patients compared to those discontinuing from placebo: dizziness, headache, nausea, diarrhea, paresthesia, irritability, vomiting, insomnia, anxiety, hyperhidrosis, and fatigue.
>
> During marketing of other SSRIs and SNRIs (serotonin and norepinephrine reuptake inhibitors), there have been spontaneous reports of adverse events occurring upon discontinuation of these drugs, particularly when abrupt, including the following: dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g., paresthesias such as electric shock sensations), anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures. Although these events are generally self-limiting, some have been reported to be severe.
>
> Patients should be monitored for these symptoms when discontinuing treatment with Cymbalta. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered.  Subsequently, the physician may continue decreasing the dose but at a more gradual rate *[see Dosage and Administration (2.4)]*.   (August 2012 Cymbalta label, Jones Decl., Exh. 1).

Cymbalta's label echoes the widespread clinical understanding of the potential for these discontinuation symptoms, which are well documented and well understood in clinical and lay literature.   *See Stopping Antidepressants: Is it Withdrawal?*, WebMD, http://www.webmd.com/depression/guide/withdrawal-from-antidepressants ("All depression drugs can potentially lead to discontinuation symptoms[.]") (last visited Feb. 24, 2015); Daniel

K. Hall-Flavin, M.D., *Antidepressant Withdrawal: Is There Such a Thing?*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/depression/expert-answers/antidepressant-withdrawal/faq-20058133 ("Antidepressant withdrawal is possible if you abruptly stop taking an antidepressant, particularly if you've been taking it longer than six weeks.  Symptoms of antidepressant withdrawal are sometimes called antidepressant discontinuation syndrome.") (last visited Feb. 24, 2015); Am. Psychiatric Ass'n, *Practice Guideline for the Treatment of Patients with Major Depressive Disorder*, 20, 40 (3d ed. 2010), *available at* http://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/mdd.pdf (cautioning that "abrupt discontinuation of SNRIs [Serotonin-Norepinephrine Reuptake Inhibitors] should be avoided wherever possible" because discontinuation symptoms may occur).  In 2005, Lilly published data on the rate of discontinuation events across its initial Cymbalta clinical trials.  That data reflected in part that 44.3% of Cymbalta patients reported in six short-term studies experienced one or more discontinuation-emergent adverse events after abrupt discontinuation of the medicine, as compared to 22.9% of placebo patients.  *See* David G. Perahia et al., *Symptoms Following Abrupt Discontinuation of Duloxetine Treatment in Patients with Major Depressive Disorder*, 89 J. Affective Disorders 207, 208 (2005), Jones Decl., Exh. 2.

Although Plaintiff devotes a great proportion of her brief to arguing the merits of her claims and issuing broadsides against Lilly and its counsel, one fundamental point is beyond dispute:  Lilly has explicitly warned about the risk of discontinuation symptoms in the Cymbalta Physician's Package Insert for over a decade.  Indeed, one federal court has already ruled that the Cymbalta discontinuation warning is adequate as a matter of law because it is "accurate, clear, consistent on its face" and "portrays with sufficient intensity the risk involved in taking the drug."  *See McDowell v. Eli Lilly & Co.*, --- F. Supp. 3d ---, 2014 WL 5801604, at *15 (S.D.N.Y.

Nov. 7, 2014) (internal quotation marks omitted).  The *McDowell* court expressly rejected the litigation-driven, backward-looking critique of the warning that Plaintiff advances in this litigation, (Pl.'s Mo., at 5-7).  *Id.* at *11 ("The warning should also be evaluated as a whole and not through the nitpicking prism of an interested legal advocate after the fact.").

### B.    The Course of the Cymbalta Litigation to Date

Although Plaintiff now claims the existence of roughly 4200 unfiled and otherwise unidentified "cases," (Pl's Mo., at 2 & n.5), a total of 57 have been filed in the past two years. Since the filing of the first suit in October 2012, *Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366 (C.D. Cal.), five cases have matured past fact discovery.[1]  To date, every court to reach a merits determination in these suits has ruled in Lilly's favor and dismissed plaintiffs' claims.  *See McDowell*, 2014 WL 5801604, at *15 (granting summary judgment on the independent grounds that Cymbalta discontinuation warning is adequate as a matter of law and that plaintiff could not establish proximate cause because his medical provider fully understood the potential risk of discontinuation symptoms);  *Carnes v. Eli Lilly & Co.*, No. 0:13-591-CMC, 2013 WL 6622915, at *7 (D.S.C. Dec. 16, 2013) (granting summary judgment because plaintiff's medical provider fully understood the potential risk of discontinuation symptoms).[2]  On December 18, 2014, Judge Wilson of the Central District of California denied certification to a putative class of plaintiffs

---

[1] *Carnes v. Eli Lilly & Co.*, No. 0:13-591-CMC (D.S.C.); *Herrera v. Eli Lilly & Co.*, No. 2:13-cv-02702−SVW−MAN (C.D. Cal.); *Hexum v. Eli Lilly & Co.*, 2:13-cv-02701−SVW−MAN (C.D. Cal.); *McDowell v. Eli Lilly & Co.*, No. 13 civ 03786 (RWS, GWG) (S.D.N.Y.); *Seagroves v. Eli Lilly & Co.*, No. CV-13-01183-PHX-DJH (D. Ariz.).  One additional case, *Carter v. Eli Lilly & Co.*, No. CV 13-02700-GHK (FFMx) (C.D. Cal.) was dismissed voluntarily with prejudice shortly following the deposition of the plaintiff, No. CV 13-02700-GHK (FFMx), Dkt. No. 87, and another case, *Lister v. Eli Lilly & Co.*, No. 2:13-cv-03019-SD (E.D. Pa.), was abandoned shortly after it was filed.

[2] A summary judgment motion is currently pending in *Herrera v. Eli Lilly & Co.*, No. 2:13-cv-02702−SVW−MAN (C.D. Cal.), before Judge Wilson.

raising consumer protection claims premised on factually identical allegations.  *See Saavedra v. Eli Lilly & Co.*, No. 2:12–cv–9366–SVW (MANx), 2014 WL 7338930, at *10-11 (C.D. Cal. Dec. 18, 2014).

In August 2014, Plaintiffs' counsel filed a slew of cases and immediately petitioned the JPML for the creation of an MDL.  Plaintiffs' counsel acknowledge in their motion that they chose not to serve any of these lawsuits while waiting for the creation of an MDL.  On December 10, 2014, however, the JPML denied their request for pre-trial centralization, noting that "most, if not all, of the common discovery" has already taken place in earlier-filed, related actions and directing the parties to "informal[ly] coordinat[e] with respect to the remaining common discovery, as well as other pretrial matters."  *In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2014 WL 7006713, at *1-2 (J.P.M.L. Dec. 10, 2014).  The Panel also noted that, "Although moving plaintiffs dispute the adequacy of Lilly's production, there is no doubt that the discovery that has occurred to date has been substantial."  *Id.* at *1.  Plaintiffs' counsel candidly admits that their prediction that "hundreds" or "thousands" of cases were waiting in the wings did not move the Panel, which is historically and justifiably skeptical of such claims.  *See, e.g.*, *In re Lipitor Mktg., Sales Practices & Prods. Liab. Litig.*, 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013) (Panel "disinclined to take into account the mere possibility of future filings in [its] centralization calculus").  The Panel directed that the near-completion of common discovery and the overlap in counsel for the parties would permit "informal coordination with respect to the remaining common discovery, as well as other pretrial matters."[3]  *In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, 2014 WL 7006713, at *2.

---

[3] In the face of 120-day service deadlines, and with no decision yet on centralization, plaintiffs proceeded with service of 16 cases in the two days prior to the denial of MDL centralization. (continued…)

Pursuant to the JPML's direction, Lilly took prompt steps to engage in the informal coordination contemplated by the Panel's December 10 Order.  Lilly proposed a series of measures intended to "ensure close coordination across cases, avoid duplication of effort, and make use of the considerable discovery provided [by Lilly] to date," including,

- making available across the litigation the then-approximately 2.8 million pages of documents produced by Lilly in earlier-filed cases, subject to the entry of an agreed-upon protective order;[4]

- making available across the litigation the transcripts of the depositions of the three 30(b)(6) depositions provided by Lilly on regulatory affairs, drug safety surveillance, and sales training matters, as well as the depositions of three Lilly employees deposed in their individual capacity;

- using a single HIPAA-compliant authorization for the collection of medical records across the litigation;

- proposing to the relevant courts a single stipulated protective order governing confidential documents consistent with the order entered in earlier-filed cases; and

- using a single outside vendor to collect and maintain all medical records secured across the cases and sharing the costs of that vendor.

Jones Decl., Exh. 3, at 1-2; Jones Decl., Exh. 4, at 2.

Plaintiffs' counsel has not meaningfully responded to any of Lilly's proposals to coordinate discovery across the actual cases on file.[5]  Rather, counsel for plaintiffs proposed

---

Following the denial of centralization, counsel for plaintiffs served an additional 16 cases on Lilly; Lilly served responsive pleadings on a schedule agreed upon by the parties; and the parties proceeded with preliminary discovery activities, including the exchange of initial disclosures and written discovery.  Jones Decl. ¶ 4.  Scheduling orders have now issued in 9 cases.  Jones Decl. ¶ 4.

[4] To date, Lilly has produced 2,791,418 pages of documents across the litigation.  Jones Decl. ¶ 5.

[5] Plaintiffs' counsel has still largely refused to provide executed medical records authorizations that would allow record collection to commence until Lilly "contact[s] each healthcare provider and find[s] out if they have a specific authorization that they use," noting that "[g]etting authorizations from my client is a pain."  Jones Decl., Exh. 5.  Given the expedited nature of discovery in this District, Lilly could not await such a delay for such basic discovery and (continued…)

"coordination" measures focused on not litigating their current and future cases, but instead proposing that the claims of their unspecified "hundreds" or "thousands" of "potential plaintiffs" be tolled for almost a year until December 31, 2015. Jones Decl., Exh. 6, at 1. On its face, this proposal is far removed from the goal of efficient prosecution of the actual pending lawsuits. It simply eliminated the need for plaintiffs' counsel to file and pursue cases within the applicable statute of limitations. Lilly respectfully declined the offer. Jones Decl., Exh. 7, at 1.

Plaintiff's counsel has now pivoted to another "coordination" strategy: seek § 1404 transfer of this case and others from the districts in which plaintiffs reside — and originally chose to file — to the Southern District of Indiana.[6] Like their prior proposals, however, Plaintiff's counsel focuses not on moving this case forward expeditiously on the schedule set by the Court but instead on delaying any meaningful resolution of this or any of the pending cases. This tactic is an avoidance of the merits, not coordination to reach a prompt and efficient merits determination as envisioned by the JPML's order.

---

demanded completed authorizations immediately. On the eve of Lilly's filing of a motion to compel, Plaintiff's counsel finally provided executed authorizations.

[6] To date, Plaintiff's counsel has moved to transfer ten other cases to the Southern District of Indiana, including another in this Court. *See Ali v. Eli Lilly & Co.*, No. 1:14-cv-01615-AJT-JFA (E.D. Va.); *Cheshier v. Eli Lilly & Co.*, No. 1:14-cv-01265-GEB-SKO (E.D. Cal.); *Woodruff v. Eli Lilly & Co.*, No. 2:14-cv-01890-GEB-SKO (E.D. Cal.); *Wheeler v. Eli Lilly & Co.*, No. 3:14-cv-01882-AJB-BLM (S.D. Cal.); *Krupp v. Eli Lilly & Co.*, No. 8:14-cv-02792-MSS-TGW (M.D. Fla.); *Valentino v. Eli Lilly & Co.*, No. 6:14-cv-01816-CEM-GJK (M.D. Fla.); *Brotherton v. Eli Lilly & Co.*, No. 8:14-cv-02876-JSM-TGW (M.D. Fla.); *Lacia-Bhoge v. Eli Lilly & Co.*, No. 6:14-cv-01286-CEM-KRS (M.D. Fla.); *Gollin v. Eli Lilly & Co.*, No. 0:14-cv-61810-WPD (S.D. Fla.); *Couch v. Eli Lilly & Co.*, No. 1:14-CV-2564-MHC (N.D. Ga.). To establish a foothold in Indiana, Plaintiff's counsel has filed (but not yet served) a single lawsuit involving a group of seven unrelated and misjoined plaintiffs, none resident in Indiana. For the same reasons that this case should not be moved to Indiana, Lilly will promptly be moving to sever the unrelated plaintiffs in that lawsuit and to transfer those plaintiffs to their home districts.

C.    **Plaintiff Gilda Hagan-Brown's Suit**

Plaintiff's motion gives virtually no attention to her allegations concerning the details of her Cymbalta treatment.  Those allegations confirm that each of Plaintiff's claims arise from a nucleus of facts centered in Virginia.

Plaintiff, a Virginia resident, suffered from fibromyalgia and osteoarthritis.  Compl. ¶ 31.  Her doctor, also a Virginia resident, prescribed Cymbalta on or around September 2012 to manage her disease.  Compl. ¶ 31; Jones Decl., Exh. 8, at 2; Jones Decl., Exh. 9, at 5.  According to the Complaint, Plaintiff stopped taking Cymbalta in March 2013 and, upon discontinuation, suffered adverse symptoms.  Compl. ¶¶ 32-33.  Recognizing that this district is at the nexus of her claims, Plaintiff filed suit in this Court against Lilly on November 26, 2014.  The Complaint asserts multiple common law claims arising under Virginia law, including negligence, design defect, failure to warn, constructive fraud, actual fraud, and breach of implied warranty.  Compl. ¶¶ 37-99.  This matter is now in active litigation under the purview of this Court.

After the JPML's denial of MDL centralization, Plaintiff served Lilly with the Complaint and summons on December 15, 2014.  (Dkt. # 16.)  Lilly answered the Complaint on January 5, 2015.  (Dkt. # 5.)  As Plaintiff notes, (Pl.'s Mo., at 2), discovery has commenced in this case.  The parties completed the conference required under Fed. R. Civ. P. 16(b), and the Court entered a Rule 16(b) Scheduling Order on January 28, 2015.  (Dkt. # 20.)  Lilly served its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) on January 22, 2015, and, by agreement, Plaintiff served her initial disclosures on February 9, 2015.  Jones Decl., Exhs. 8, 16.  On January 9, 2015, Lilly also served Plaintiff with its First Set of Requests for Production of Documents, pursuant to Fed. R. Civ. P. 34, and First Set of Interrogatories, pursuant to Fed. R. Civ. P. 33.  Jones Decl., Exh. 10.  Plaintiff served responses and objections to those requests on January 26, 2015, and February 11, 2015.  Jones Decl., Exhs. 11-12.  Lilly served a deposition notice for the deposition

of a healthcare professional identified in Plaintiff's initial disclosures on February 23, 2015.

Jones Decl., Exh. 13.  Counsel for the parties have applied for and been granted *pro hac vice*

admission.  (Dkt. # 12-15.)  On February 4, 2015, Plaintiff served her First Set of Interrogatories,

her First Set of Requests for Production of Documents, and her First Set of Requests for

Admission on Lilly, and Lilly served objections in accordance with the rules of this Court.  Jones

Decl., Exh. 14.  Although Plaintiff's counsel initially resisted providing medical authorizations to

allow the prompt collection of medical records, they ultimately provided such authorizations

within the last week under threat of motion practice.   Jones Decl., Exh. 15.

## II.    ARGUMENT

Although a district court may transfer a matter to "any other district or division where it

might have been brought,"  28 U.S.C. § 1404(a), the burden is on the movant to establish that the

case should be transferred.  *Heinz Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d

660, 667 (E.D. Va. 2010).   In deciding the propriety of transfer, this Court weighs multiple

factors, including:

(1)    the plaintiff's choice of forum;

(2)    ease of access to sources of proof;

(3)    the convenience of the parties and witnesses;

(4)    the cost of obtaining the attendance of witnesses;

(5)    the availability of compulsory process;

(6)    the interest in having local controversies decided at home;

(7)    the court's familiarity with the applicable law; and

(8)    the interest of justice.

"[T]he moving party must show that the balance of convenience among the parties and

witnesses is beyond dead center, and strongly favors the transfer sought."  *Mullins v. Equifax*

*Info. Servs., LLC*, No. 3:05-CV-888, 2006 WL 1214024, at *5 (E.D. Va. Apr. 28, 2006) (quoting

*Medicenters of Am., Inc. v. T & V Realty & Equip. Corp.*, 371 F. Supp. 1180, 1184 (E.D. Va. 1974)) (internal quotation marks omitted).

Plaintiff cannot meet her heavy burden to demonstrate that this case should be transferred.  *See Smithfield Packing Co. v. V. Suarez & Co.*, 857 F. Supp. 2d 581, 585 (E.D. Va. 2012).   Here, a predominance of factors militate in favor of maintaining venue in the Eastern District of Virginia — including Plaintiff's failure to demonstrate a legally sufficient basis for transferring a suit now proceeding through discovery in Plaintiff's originally chosen venue; the access to and convenience of key third-party witnesses and ability to compel the presence of these key witnesses at trial; and the interest of the Commonwealth of Virginia in the adjudication of disputes brought by its citizens by experienced Virginia-based jurists.[7]   In short, Plaintiff has not shown that the record "strongly favors" transfer, as required in this Court.

### A.    Plaintiff Chose the Eastern District of Virginia, And Circumstances Do Not "Strongly Favor" Transfer.

A plaintiff who seeks to uproot a case filed and prosecuted in the court of her choosing faces a "heavy burden" in seeking transfer.  *See Smithfield Packing Co.*, 857 F. Supp. 2d at 585.   Indeed, "[t]he burden should be at least as heavy on a plaintiff who seeks to change the forum originally chosen as it is when the defendant moves to transfer."   15 Charles Alan Wright et al., Federal Practice & Procedure § 3848 (4th ed. 2014).   This rule prevents the use of Section 1404 as a vehicle for gamesmanship.   "[A]lthough a plaintiff's first choice of venue is strongly favored, subsequent venue choices are not given the same deference because, if they were, a motion to transfer venue could become an unchecked tool for the plaintiff to shop among forums

---

[7] Courts in the Fourth Circuit also consider: the presence of a forum selection clause; the enforceability of a judgment; and calendar congestion.  *See, e.g.*, *In re Complaint of Norfolk Dredging Co.*, 240 F. Supp. 2d 532, 534-35 (E.D. Va. 2002).

and between judges." *Bobosky v. Adidas AG*, No. CV 10-630-PK, 2010 WL 4853295, at *6 (D. Or. Oct. 8, 2010) (internal quotation marks omitted); *see also Orrell v. Motorcarparts of Am., Inc.*, No. CIV 306CV418-C, 2007 WL 895503, at *3 (W.D.N.C. Mar. 22, 2007) (finding no Fourth Circuit authority giving weight to a plaintiff's second choice of venue). For that reason, plaintiffs' transfer motions receive close scrutiny. To prevail on such a motion, a plaintiff must offer a "legally-sufficient basis," such as a change in circumstances, for revisiting its initial choice of venue. *Orrell*, 2007 WL 895503, at *3; *see also Zep Inc. v. Midwest Motor Supply Co.*, No. 1:08-CV-550, 2009 WL 2424336, at *2 (W.D.N.C. Aug. 4, 2009) (noting that no changed circumstances warrant retransfer of case).

Plaintiff offers no meaningful justification for this abrupt change in course in the midst of active discovery. Instead, Plaintiff insists that transfer will "reduce costs, eliminate duplication of effort, and streamline" the litigation for the parties and the Court. (Pl.'s Mo., at 18.) This broadbrush explanation is insufficient on its face to satisfy this Court's high standard.

*First*, amorphous assertions of potential cost savings cannot satisfy the bar for securing transfer. Contrary to Plaintiff's suggestion, there is nothing remarkable about the proposition that a party could bear the costs of litigating a suit that she has elected to bring in her individual capacity. The statute envisions that obligation. *See* 28 U.S.C. § 1920. Nor is the potential for cost-sharing a basis for changing venue to the Southern District of Indiana. Plaintiff does not explain why transfer of this suit to Indiana would now facilitate cost-sharing amongst the plaintiffs that could not otherwise be secured simply through communication among plaintiffs' counsel.[8] To the contrary, given the coordination of plaintiffs' counsel across the pending

---

[8] Plaintiff's offhand suggestion that Plaintiff "may be able to share the costs of a multi-plaintiff trial," (Pl.'s Mo., at 17), with other litigants ignores the aversion among courts to such joint (continued…)

litigation, there is nothing to prevent counsel from making whatever cost-sharing arrangements they deem appropriate while the cases proceed in their existing venues. In addition, the considerable document discovery to date — and Lilly's offer to make that discovery available across the litigation — will result in meaningful cost savings.

*Second*, Plaintiff's claims regarding the convenience of the parties and the courts, including the potential to "streamlin[e]" the proceedings, cannot overcome her weighty burden. As a threshold matter, the parties have taken steps to coordinate communications and procedural matters across the cases to avoid duplication of effort, including establishing unified deadlines for the filing of responsive pleadings and exchange of certain preliminary discovery materials. *See supra* Part I.B-C; Jones Decl., Exhs. 8-14. Plaintiff offers no explanation for why those continued efforts, if undertaken in earnest, would not be sufficient for purposes of the pending cases. Nor does Plaintiff explain how transfer would relieve any individual plaintiff of his or her obligation to respond to discovery propounded by Lilly. To be sure, it would not. *See In re E. Dist. Repetitive Stress Injury Litig.*, 850 F. Supp. 188, 195 (E.D.N.Y. 1994) (holding that consolidation of 78 products liability actions would not result in economies of scale because defendants would still be entitled to discovery in each plaintiff's home district). Moreover, to the extent Plaintiff's arguments relate to easing the burden on the parties' attorneys, (Pl.'s Mo., at 1-2), "convenience to counsel is not an appropriate matter for consideration in resolving the appropriateness of a motion to transfer venue." *Cognitronics Imaging Sys., Inc. v. Recognition Research Inc.*, 83 F. Supp. 2d 689, 698 (E.D. Va. 2000).

---

proceedings due to their inherent potential prejudice. *See, e.g.*, *Michael v. Wyeth, LLC*, No. CIV.A. 2:04-0435, 2011 WL 1527581, at *3 (S.D.W. Va. Apr. 20, 2011) ("[C]onsolidating [products liability] cases for trial would create a significant risk of jury confusion and prejudice to defendants. The predominance of individual issues also creates a low risk of inconsistent adjudications of common factual and legal issues should these cases proceed separately.").

Finally, Plaintiff cannot justify transfer under § 1404 as a way to relieve burdens to the judiciary as a whole. While impact on the judiciary is always a concern for courts contemplating transfer applications, the proper body to entertain the kind of judiciary-wide concerns raised here is the congressionally-designated JPML, whose primary mission is "promote the just and efficient conduct" of such lawsuits nationwide in its exercise of control over § 1407 transfers. With over fifty cases pending, it simply makes no sense, and risks conflicting determinations, for the individual courts overseeing each of these fifty lawsuits to draw conclusions about what best serves the interests of the federal judiciary as a whole. Plaintiff's remedy is not a spate of § 1404 transfer motions, but instead re-petitioning the JPML if it believes changed circumstances will now meet § 1407's statutory requirements.

Indeed, accommodating this gambit at this juncture would work a fundamental unfairness and impose needless additional burden on the parties and the courts. Plaintiff chose to file this case in the Eastern District of Virginia, asserting that venue was proper in this Court. Compl. ¶ 7. Based upon Plaintiff's selection of venue, the parties have proceeded through responsive pleadings; the Fed. R. Civ. P. 16(b) conference and order; initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1); the service of and response to written discovery requests; and the release of health information authorizations. (Dkt. # 20); Jones Decl., Exhs. 8-16. Counsel for the parties have sought *pro hac vice* admission, and this Court presided over the parties' initial scheduling conference and set a schedule for fact and expert discovery, pretrial, and trial. (Dkt. # 12-15, 19, 21.) Having elected to file in this Court and thus drawn upon the resources of the parties and the Court in prosecuting her suit here, Plaintiff should not now be allowed to rely on purported issues of convenience "that even if true [were] insufficient to influence the Plaintiff's choice of forum in the first instance." *Orrell*, 2007 WL 895503, at *3. "[A]s a matter of fairness,

[plaintiff] should not now be heard to complain about this venue." *Phoenix Solutions, Inc. v. Sony Elecs., Inc.*, No. C 07-02112 MHP, 2007 WL 4357602, at *4 (N.D. Cal. Dec. 11, 2007).

In sum, there is no legally sufficient basis for transfer under § 1404. Plaintiff's counsel's true aim, of which they make no secret, is to use the transfer statute as a tool for re-litigating the JPML's denial of MDL centralization. Courts have justifiably rejected similar maneuvers. *See In re E. Dist. Repetitive Stress Injury Litig.*, 850 F. Supp. at 194 ("A primary goal of plaintiffs in suing in this district was apparently to effect a *de facto* multidistrict litigation. Therefore, little deference need be shown to their choice of forum."); *Bristow v. Lycoming Engines*, No. CIV. S-06-1947 LKK/GGH, 2007 WL 1106098, at *3 (E.D. Cal. Apr. 10, 2007) (denying defendants' motion to transfer where defendants' previous request for an MDL had been denied, transfer motion was based on the same facts that were before the MDL panel, and defendants "fail[ed] to explain how, if at all, circumstances have changed" to warrant transfer under 1404(a)); *cf. Acterna, L.L.C. v. Adtech, Inc.*, 129 F. Supp. 2d 936, 940 (E.D. Va. 2001) (giving little weight to subsequently filed related litigation and noting that doing so would "encourage binary lawsuits in different jurisdictions . . . all in an effort to tip the scale in favor of venue transfer").

### B.     This District Has the Most Contacts with Plaintiff's Claims.

"Typically the most appropriate venue is where a majority of events giving rise to the claim arose." *Copley v. Wyeth*, No. 09-722, 2009 WL 2160640, at *4 (E.D. Pa. July 17, 2009) (internal quotation marks omitted); *see also GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F. Supp. 2d 517, 519 (E.D. Va.1999) (weight accorded a plaintiff's choice of venue "varies in proportion to the connection between the forum and the cause of action"). As courts in this Circuit and others have repeatedly found, in cases alleging injury from pharmaceutical products, "the claims typically arise in the plaintiff's home district." *Copley*, 2009 WL 2160640, at *4; *see also Leonard v. Mylan, Inc.*, 718 F. Supp. 2d 741, 744 (S.D.W. Va. 2010); *In re Consol. Parlodel*

*Litig.*, 22 F. Supp. 2d 320, 326 (D.N.J. July 27, 1998).  This precedent rests on the basic premise that the Plaintiff's ingestion of — and alleged injury from — a medicine are at the center of pharmaceutical product liability claims.  Thus, the site of those events is the most rational venue. *See, e.g.*, *McCraw v. GlaxoSmithKline*, No. CIV.A. 12-2119, 2014 WL 211343, at *5 (E.D. Pa. Jan. 17, 2014) ("Though the development of Paxil is alleged to have occurred within the Eastern District of Pennsylvania, the 'operative facts' (e.g., where ingestion and injury occurred) are those which are alleged to have occurred within the Southern District of Texas."); *Arnett v. Mylan, Inc.*, No. 2:10-CV-00114, 2010 WL 3220341, at *2 (S.D. W. Va. Aug. 13, 2010) (describing the above as the "relevant facts" in plaintiff's products liability lawsuit); *In re Aredia & Zometa Prods. Liab. Litig.*, No. 3:06-MD-1760, 2008 WL 686213, at *3 (M.D. Tenn. Mar. 6, 2008) (describing the above as the "central facts" of a products liability lawsuit).

The core events giving rise to Plaintiff's claims occurred in the Eastern District of Virginia.  Plaintiff resides in Virginia, (Compl. ¶ 2), a material factor in determining the appropriate locus of suit and favoring venue in this Court.  *See Hanover Ins. Co. v. Paint City Contractors, Inc.*, 299 F. Supp. 2d 554, 556 (E.D. Va. 2004) ("Plaintiff's choice of venue is entitled to substantial weight, unless plaintiff chooses a foreign forum and the cause of action bears little or no relation to that forum."); *Zeevi v. Am. Home Prods. Corp.*, No. CIV.A. 99-CV-20277, 2002 WL 92902, at *1 (E.D. Pa. Jan. 24, 2002) (deference to plaintiff's choice of forum "reduced" where plaintiff seeks to pursue suit "outside the forum in which the Plaintiff is a resident"); *Boksenbaum v. Abbott Labs.*, No. 09-CV-5425 ENV JMA, 2012 WL 6061360, at *3 (E.D.N.Y. Dec. 6, 2012) ("Obviously, if the roles were reversed, that is, if defendants were seeking transfer away from the district where plaintiffs reside and the pertinent conduct occurred,

and plaintiffs were resisting, the same case law would give each plaintiff's initial choice of forum considerable, if not insurmountable, weight.").

Moreover, the Complaint includes no assertion that the alleged marketing and sale of Cymbalta leading to Plaintiff's treatment with the medicine occurred anywhere other than Virginia. *See Leonard*, 718 F. Supp. 2d at 745 (ruling that plaintiffs' venue of residence was appropriate forum because "the events or omissions giving rise to the plaintiffs' claims" occurred there, including the prescription and use of the medicine); *In re Consol. Parlodel Litig.*, 22 F. Supp. 2d at 326 ("Although Parlodel was designed and manufactured in New Jersey, and NPC made various decisions in New Jersey, Parlodel was marketed and consumed by Plaintiffs in their home districts."); *Boksenbaum*, 2012 WL 6061360, at *1 (overriding plaintiff's choice of forum in favor of plaintiff's venue of residence because that is where "most of the critical events" occurred, including plaintiffs' prescription of the medication in question and receipt of medical treatment) (internal quotation marks omitted); *Hutson v. A.H. Robins Co.*, 846 F. Supp. 14, 16 (S.D.N.Y. 1994) (overriding plaintiff's choice of forum in favor of plaintiff's venue of residence at the time of her medical treatment, where discovery would be "centered"). Nor is there any claim that Plaintiff either took Cymbalta or experienced any alleged discontinuation symptoms — or received any treatment for those symptoms — outside of Virginia. *See* Compl. ¶¶ 31-33. Indeed, the only healthcare professionals identified in Plaintiff's initial disclosures are reported to have Virginia addresses. *See* Jones Decl., Exh. 8, at 2-3.

Lilly's residence in the Southern District of Indiana does not, as Plaintiff argues, change this analysis. Plaintiff leans heavily on the argument that transfer to the Southern District of Indiana is warranted because it is where Lilly resides and is therefore more convenient for Lilly. But courts have repeatedly ruled in products liability failure-to-warn suits that the home venue of

the plaintiff — not that of the defendant pharmaceutical manufacturer — is the appropriate locus

of suit.  *See Locklear v. Mylan Inc.*, No. 1:10CV164, 2011 WL 3296635, at *6 (N.D.W. Va.

Aug. 1, 2011) (transferring suit to venue of plaintiff's residence even though the design,

marketing, and testing of the product at issue occurred in a different venue); *In re Consol.

Parlodel Litig.*, 22 F. Supp. 2d at 326 (transferring suit to venue of plaintiff's residence even

though product at issue was designed and manufactured by defendant in different venue);

*Painter's Dist. Council No. 30 Health & Welfare Fund v. Amgen, Inc.*, No. CV 07-3880 PSG

(AGRx), 2007 WL 4144892, at *4 (C.D. Cal. Nov. 13, 2007) (transferring suit to venue of

plaintiff's residence even though decisions regarding promotion and marketing of product at

issue were made by defendant in different venue); *McLaughlin v. GlaxoSmithKline, L.L.C.*, C.A.

No. 12-3272, 2012 WL 4932016, at *3 (E.D. Pa. Oct. 17, 2012) (transferring suit to venue of

plaintiff's residence even though product at issue was designed and manufactured by defendant

in different venue); *Copley*, 2009 WL 2160640, at *4 (transferring suit to venue of plaintiff's

residence even though product at issue was designed and manufactured by defendant in different

venue); *In re Aredia & Zometa Prods. Liab. Litig.*, 2008 WL 686213, at *3-4 (transferring suit to

venue of plaintiff's residence and away from pharmaceutical company's venue of residence);

*McCraw*, 2014 WL 211343, at *5 (transferring suit to venue of plaintiff's residence even though

product at issue was designed and manufactured by defendant in different venue).  This has been

the case even where the plaintiff initially filed suit in the venue housing the defendant

manufacturer and enjoyed a limited presumption in favor of its initial choice of venue.  *See, e.g.*,

*Locklear*, 2011 WL 3296635, at *2-3; *McLaughlin*, 2012 WL 4932016, at *8.  The same result is

dictated here.  Plaintiff selected this venue, actively litigated this suit here, and, despite the plain

ties to this jurisdiction, seeks transfer solely to create a coordinated proceeding already rejected

by the panel of judges with the exclusive charge to adjudicate the propriety of matters for centralization under 28 U.S.C. § 1407.

### C.  The Venue of This Court Ensures Availability of Process to Compel Trial Attendance and Enhances Convenience of Non-Party Witnesses.

Maintaining venue in this Court preserves the parties' ability to secure live trial testimony from the key third-party fact witnesses, including the medical professionals who prescribed Cymbalta to Plaintiff and provided treatment for any alleged injuries arising from Plaintiff's discontinuation of therapy.   Fed. R. Civ. P. 45(c)(1).   Although Plaintiff dismisses this consideration, the testimony of these witnesses is crucial.   Indeed, in the products liability setting, for "issues such as specific causation, failure to warn, and damages, testimony from the physicians and other medical providers who prescribed and administered the drugs to Plaintiffs is essential for both parties."   *In re Aredia & Zometa Prods. Liab. Litig.*, 2008 WL 686213, at *2. This Court has long recognized the preference for live trial testimony that animates the Federal Rules, particularly for witnesses whose testimony has significant bearing on the disposition of the relevant claims.   *See, e.g.*, *Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 718 (E.D. Va. 2005) ("Naturally, in contrast to witness testimony that is merely cumulative, greater weight should be accorded inconvenience to witnesses whose testimony is central to a claim and whose credibility is also likely to be an important issue.") (internal quotation marks omitted); *see also id.* ("[L]ive testimony is preferred to other means of presenting evidence.").   Plaintiff's proposal to transfer this suit away from the venue of residence for the key third-party witnesses undermines this longstanding doctrine.

The continued litigation of this suit within the venue of this Court serves the related interest of enhancing convenience for key third-party witnesses, whose deposition and eventual trial testimony will be central to the claims in this case.   This Court "draw[s] a distinction

between party witnesses and non-party witnesses and afford[s] greater weight to the convenience of non-party witnesses." *Finmeccanica S.p.A. v. Gen. Motors Corp.*, No. 1:07CV794 (JCC), 2007 WL 4143074, at *5 (E.D. Va. Nov. 19, 2007) (internal quotation marks omitted).  This is particularly so for non-party healthcare professionals whose testimony is critical — and in some cases dispositive — of plaintiffs' claims in pharmaceutical products liability suits.  *See, e.g.*, *Locklear*, 2011 WL 3296635, at *2 (transferring case to venue of plaintiff's residence where non-party witnesses with material information regarding plaintiff's medical history, treatment, and injuries reside); *Copley*, 2009 WL 2160640, at *5-6 (emphasizing the importance of the convenience of non-party witnesses, particularly treating physicians, in a products liability action).  Lilly cannot compel Plaintiff's doctors to appear at trial in Indiana, nor would it likely be able to convince any of them to appear voluntarily given the travel and inconvenience involved.  Even were a physician to volunteer, the imposition of these significant opportunity costs on witnesses who are not parties to this suit is unwarranted given Plaintiff's original election to file in this Court and the connection of this venue to the key events alleged.  *See Locklear*, 2011 WL 3296635, at *3 ("[T]he consideration of the burdens placed on non-party witnesses is paramount.  These individuals with no stake in this litigation should not be asked to incur the inconvenience of traveling . . . even if voluntarily."); *In re Aredia & Zometa Prods. Liab. Litig.*, 2008 WL 686213, at *3 (noting that even if treating physicians were willing to testify live in the transferor court, "the inconvenience imposed upon them by requiring them to travel . . . weighs in favor of transferring the cases" to venue of plaintiff's residence).

Although some potential witnesses are Lilly employees who reside in the Southern District of Indiana, the number and significance of these potential witnesses is outweighed by the number of core witnesses located closer to the Eastern District of Virginia, particularly non-party

medical professionals.  Plaintiff contends that the convenience of the witnesses is neutral as to transfer because in either Virginia or Indiana, certain witnesses will be inconvenienced.  Plaintiff is incorrect:  The convenience of non-party medical professional witnesses — here, ostensibly Virginia residents — is more significant to the transfer analysis.  *See Heinz Kettler GMBH & Co.*, 750 F. Supp. 2d at 669 (stating that the inconvenience of party witnesses "merits little weight in the transfer analysis"); *Zeevi*, 2002 WL 92902, at \*2 & n.3 (transferring to venue that was more convenient for "Plaintiff's treating physicians, who are essential witnesses to the litigation" even though this would render defendant employee witnesses unavailable because employees' deposition testimony could be used at trial instead).  Because the non-party medical professional witnesses reside in Virginia, convenience of the witnesses weighs against transfer.

### D. This Court Has Greater Familiarity with Virginia Law and Maintaining Venue Here Protects Virginia's Interest in the Resolution of This Case.

Plaintiff's transfer proposal would, in addition, jeopardize (1) the parties' interests in having Plaintiff's claims resolved by a Virginia court familiar with the law of this jurisdiction and (2) the commonwealth of Virginia's interest in the adjudication of the claims raised in this suit.

First, Plaintiff brings state common law and statutory claims subject to resolution under Virginia law.  In the Fourth Circuit, a federal court sitting in diversity over state law claims applies the conflicts laws of the forum state — here, Virginia.  *Fed. Ins. Co. v. Smith*, 63 F. App'x 630, 632 (4th Cir. 2003).  The law of Virginia will, therefore, govern Plaintiff's claims.  *See, e.g.*, *Sykes v. Bayer Pharm. Corp.*, 548 F. Supp. 2d 208, 214 & n.2 (E.D. Va. 2008) (Virginia law applied to Virginia resident plaintiff's product liability claims).  As this Court has observed, where Virginia law applies to a plaintiff's claim, a federal court located in Virginia is more familiar with Virginia law.  *See, e.g.*, *JTH Tax, Inc. v. Whitaker*, No. CIV. 2:07CV170,

2007 WL 2126300, at *5 (E.D. Va. July 16, 2007); *see also Gulf Oil v. Gilbert*, 330 U.S. 501, 509 (1947) ("There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case.").  This greater familiarity with existing Virginia law favors maintaining venue here.

Similarly, Virginia's interest in the adjudication and resolution of Plaintiff's claims counsels in favor of maintaining venue in this Court.  *See Coors Brewing Co. v. Oak Beverage, Inc.*, 549 F. Supp. 2d 764, 773 (E.D. Va. 2008) ("[C]ourts have a strong interest in having local controversies decided at home.").  As reflected in the allegations of the Complaint, the core events from which Plaintiff's claims arise — her treatment with Cymbalta and alleged symptoms upon discontinuation of therapy — are grounded in Virginia.  As a result, the citizens and courts of Virginia have a greater interest in adjudicating this case.

## III.    <u>CONCLUSION</u>

For the above reasons, Lilly respectfully requests that the Court deny Plaintiff's motion to transfer.

DATED this 25th day of February, 2015.

By: */s/* Jeffrey T. Bozman
    Jeffrey T. Bozman
    Covington & Burling LLP
    One CityCenter
    850 Tenth Street, NW
    Washington, DC 20001
    Telephone:  (202) 662-5829
    Facsimile:  (202) 778-5829
    jbozman@cov.com

    Attorney for Defendant
    Eli Lilly and Company

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of February, 2015, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

Peter A. Miller
Brielle Marie Hunt
Miller Legal LLC
175 S. Pantops Drive, Third Floor
Charlottesville, VA 22911
Tel: (434) 529-6909
Fax: (888) 830-1488
Email: PMiller@MillerLegalLLC.com
bhunt@millerlegalllc.com

R. Brent Wisner, Esq. (*pro hac vice*)
BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Tel: (310) 207-3233
Fax: (310) 820-7444
Email: rbwisner@baumhedlundlaw.com

*Counsel for Gilda Hagan-Brown*

/s/

Jeffrey Todd Bozman (VSB 83679)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-5829
Fax: (202) 778-5829
jbozman@cov.com
*Counsel for Eli Lilly and Company*